**No. 25-1315**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

―――――――――――――――

**GARY TEDERICK and LISA TEDERICK,**

*Plaintiffs-Appellants,*

v.

**LOANCARE, LLC,**

*Defendant-Appellee.*

―――――――――――――――

On Appeal from the United States District Court
For the Eastern District of Virginia
No. 2:22-cv-00394-RAJ-DEM

―――――――――――――――

**Brief of *Amicus Curiae* Mortgage Bankers Association in
Support of Defendant-Appellee and Affirmance**

―――――――――――――――

Sam Bragg
**ALSTON & BIRD LLP**
2200 Ross Ave.
Ste. 2300
Dallas, TX 75201
Telephone: (214) 922-3400
sam.bragg@alston.com

Nanci Weissgold
**ALSTON & BIRD LLP**
The Atlantic Building
950 F Street, NW
Washington, DC 20004
Telephone: (202) 239-3300
nanci.weissgold@alston.com

*Counsel for Amicus Curiae*

## <u>TABLE OF CONTENTS</u>

**Page**

IDENTITY AND INTEREST OF *AMICUS CURIAE* .............................2

ISSUE PRESENTED .................................................................3

ARGUMENT .........................................................................6

    **I.**   **This Court should affirm on the ground that LoanCare did not overcharge interest**.................................................**6**

    **II.**  **LoanCare did not overcharge interest because the Tedericks' interest accrued monthly and in arrears ..11**

    A.   Under the Note and Deed of Trust, the Tedericks' interest accrued monthly and in arrears ...........................12

    B.   Under the Fannie Mae Servicing Guidelines, the Tedericks' interest accrued monthly and in arrears............................17

        1.   Fannie Mae and Freddie Mac introduce the Fannie Mae/Freddie Mac uniform instruments ......................17

        2.   Fannie Mae publishes Servicing Guidelines that are relevant to interpreting the uniform instruments ......19

        3.   The Servicing Guidelines confirm that interest accrues monthly in arrears .....................................................22

        4.   The Tedericks fail to distance themselves from the Fannie Mae Servicing Guidelines................................24

    CONCLUSION ...................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Branch Banking & Tr. Co. v. Witmeyer*,
    No. 3:10-cv-55-HEH-DWD, 2011 WL 3297682 (E.D. Va. 2011) ...... 8, 9

*Chawla v. Transamerica Occidental Life Ins. Co.*,
    440 F.3d 639 (4th Cir. 2006) .................................................... 7, 10, 26

*Davis v. Bank of Am., N.A.*,
    No. CV ELH-19-1010, 2019 WL 4958060 (D. Md. Oct. 8, 2019) ........ 13

*Erie Railroad Co. v. Tompkins*,
    304 U.S. 64 (1938) .................................................................. 7

*In re Fannie Mae Sec.*,
    247 F.R.D. 32 (D.D.C. 2008) ................................................ 21

*Knick v. Twp. of Scott, Pennsylvania*,
    588 U.S. 180 (2019) (Kagan, J., Dissenting) ........................ 7

*Kolbe v. BAC Home Loans Servicing, LP*,
    738 F.3d 432 (1st Cir. 2013) .............................................. 20, 21, 24

*Matheson v. Ocwen Fed. Bank FSB*,
    No. 1:05-CV-02747-ENV-LB, 2008 WL 11413560 (E.D.N.Y.
    June 18, 2008) .................................................................... 14

*Piszel v. United States*,
    833 F.3d 1366 (Fed. Cir. 2016) .......................................... 17

*Puentes v. Wells Fargo Home Mortg., Inc.*,
    160 Cal. App. 4th 638 (Cal. App. 2008) ............................. 15

*Sheehan v. Saoud*,
    650 F. App'x 143 (4th Cir. 2016) ...................................... 7, 8, 9

*St. Paul Fire & Marine Ins. Co. v. Jacobson*,
    48 F.3d 778 (4th Cir. 1995) ............................................. 7, 10

*Strawser v. Atkins*,
290 F.3d 720 (4th Cir. 2002)............................................................26

*Tederick v. LoanCare*,
LLC, No. 2:22-CV-394, 2024 WL 1223446 (E.D. Va. Mar. 21,
2024)...................................................................................................10

*Time Warner Entm't-Advance / Newhouse P'ship v. Carteret-
Craven Elec. Membership Corp.*,
506 F.3d 304 (4th Cir. 2007)............................................................10

*Valentine v. Sugar Rock, Inc.*,
745 F.3d 729 (4th Cir. 2014)...............................................................7

## Rules

Fed. R. App. P. 26.1(a)........................................................................1

Fed. R. App. P. 29(a)(4)(E) .................................................................2

Fed. R. App. P. 32(f) ...........................................................................1

## Statutes

12 U.SC. § 1716 (Fannie Mae Charter Act)......................................17

West Virginia Consumer Credit and Protection Act (WVCCPA)... passim

W. Va. Code § 46A-2-127(d) ......................................................10, 26

W. Va. Code § 46A-2-128.............................................................10, 26

## Other Authorities

Brief for West Virginia as *Amicus Curiae* ..........................................4

Andrea J. Boyack, *Laudable Goals and Unintended Consequences:
The Role and Control of Fannie Mae and Freddie Mac*, 60 Am.
U.L. Rev. 1489 (2011) .......................................................................18

Fannie Mae 10-K, *available at*,
https://fanniemae.gcs-web.com/node/44631/html..............................17

Fannie Mae, Loan Servicing Data Utility Data Definitions,
*available at*,
https://singlefamily.fanniemae.com/media/16336/display ........... 22, 23

Fannie Mae Mortgage Selling and Servicing Contract at § V.A.3
*available at*,
https://singlefamily.fanniemae.com/media/35796/display ................. 20

Fannie Mae Uniform Instruments Fact Sheet, *available at*
https://singlefamily.fanniemae.com/media/27911/display ................. 19

Julia Patterson Forrester, *Freddie Mac Uniform Mortgage
Instruments: The Forgotten Benefit to Homeowners*, 72 Mo. L.
Rev. 1077 (2007) ................................................................................. 18

U.S. Dep't of Hous. & Urb. Dev., *The Secondary Market in
Residential Mortgages* (1982) ..................................................... 17, 18

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), *Amicus Curiae* Mortgage Bankers Association states that it is a non-profit corporation that has no parent corporation. No publicly held corporation owns 10% or more of its stock.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The Mortgage Bankers Association (MBA) is a national association representing over 2,200 members of the real estate finance industry. MBA seeks to strengthen the nation's residential and commercial real estate markets, to support sustainable homeownership, and to extend access to affordable housing to all Americans. MBA is interested in this case because its outcome will directly impact MBA's members, the real estate finance industry more broadly, and all whom it serves.

All parties have consented to *Amicus Curiae* filing this brief.[1]

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amicus Curiae* states that: (i) no party's counsel authored the brief in whole or in part; (ii) no party nor their counsel contributed money that was intended to fund preparing or submitting the brief; and (iii) no person other than *Amicus Curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

## ISSUE PRESENTED

Whether this Court should affirm the district court's grant of summary judgment on the ground that LoanCare did not overcharge interest and thus did not violate the West Virginia Consumer Credit and Protection Act (WVCCPA).

## SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment because LoanCare did not overcharge interest. But on appeal, Appellants and their *amici* ask this Court to reverse. In their view, "the district court rewrote West Virginia's Consumer Credit and Protection Act (WVCCPA) on the fly"[2] to "require proof of intent."[3] This argument is a red herring.

Whether the Tedericks' WVCCPA claims required proof of intent is a potentially novel or difficult question of state law, which well-established principles of federalism caution this Court should avoid. When sitting in diversity, federal courts are charged with faithfully applying state law, but they are not supposed to go beyond this. Which is why this Court regularly declines to rule on novel or difficult state-law questions when the case can be resolved on other grounds.

Here, this Court should affirm on the other, more straightforward ground that LoanCare did not overcharge interest. The Tedericks argue that they were overcharged interest because LoanCare applied their payments in the wrong order. But this argument turns on the faulty

---

[2] Br. for West Virginia as *Amicus Curiae* at 1.

[3] Appellant's Br. at 13.

assumption that under the Tedericks' Note and Deed of Trust, interest accrued daily, as opposed to monthly in arrears. Because interest accrued monthly in arrears, the Tedericks owed one month's interest during each monthly payment cycle (calculated at the beginning of each payment cycle), regardless of the order that LoanCare applied their payments.

The language of the Tedericks' Note and Deed of Trust shows that their interest accrued monthly. In the residential mortgage industry, interest accruing monthly is the default on closed end mortgages, and neither document contradicts this by specifying that interest accrues daily. At the same time, both documents contain language that payments are applied to interest first, so there is no benefit to making payments early, which is a contractual hallmark of interest accruing monthly.

Further, the Fannie Mae Servicing Guidelines confirm that the Tedericks' interest accrued monthly. The Servicing Guidelines serve as an industry guidepost for interpreting Fannie Mae/Freddie Mac uniform instruments like the Tedericks' Note and Deed of Trust. And the Servicing Guidelines provide that interest under the uniform instruments is calculated following a 30/360 method. Under this method, interest accrues monthly in arrears.

Because the Tedericks' interest accrued monthly in arrears, LoanCare did not overcharge interest. Thus, the district court properly granted summary judgment, because if LoanCare did not overcharge interest, it did not violate the WVCCPA. This Court should affirm on this ground and should bypass entirely the potentially novel or difficult state-law question of whether the WVCCPA requires proof of intent.

## ARGUMENT

### I. This Court should affirm on the ground that LoanCare did not overcharge interest

As the district court recognized, this case at its core is "no more than a billing dispute."[4] Yet on appeal, Appellants and their *amici* try to make this case about a potentially novel and difficult question of state law. In doing so, they invite this Court to effectively create West Virginia public policy on the scope of the WVCCPA. Under principles of federalism, this Court should decline that invitation to rule on a potentially novel or difficult state-law question because the district court can and should be affirmed on other grounds.

---

[4] JA2752–53.

"[T]he principles of federalism first identified by the Supreme Court of the United States in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), impose upon [federal courts] the duty to decide diversity actions through the faithful application of state law." *Valentine v. Sugar Rock, Inc.*, 745 F.3d 729, 735 n.3 (4th Cir. 2014). Bound by these principles of federalism, a federal court sitting in diversity "should not create . . . that State's public policy." *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995). Rather, federal courts should exercise judicial constraint and "avoid deciding more than is necessary to resolve a specific case . . . . particular[ly] . . . when a federal court is seemingly faced with a state-law issue of first impression." *Chawla v. Transamerica Occidental Life Ins. Co.*, 440 F.3d 639, 648 (4th Cir. 2006). Or said another way, "federal courts should refrain whenever possible from deciding novel or difficult state-law questions." *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 221 (2019) (Kagan, J., Dissenting).

It is for this reason that this Court and courts in the Fourth Circuit regularly decline to rule on novel or difficult state-law questions. For example, in *Sheehan v. Saoud*, this Court declined to decide whether a

violation of the West Virginia Uniform Fraudulent Transfer Act (WVUFTA) sounded in tort and could thus support a claim for civil conspiracy. *See* 650 F. App'x 143, 151–55 (4th Cir. 2016). The Court explained that "case law in West Virginia [was] bereft of guidance" on the issue and it was "reticent to expand the bounds of West Virgina policy by recognizing a civil conspiracy claim for violation of the WVUFTA for the first time." *Id.* at 155. In the Court's view, "[a]bsent a strong countervailing federal interest . . . [it] should not elbow its way into this controversy to render what may be an uncertain and ephemeral interpretation of state law." *Id.* (quoting *Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007)). For that reason, "the Court decline[d] to make such a policy determination to recognize that a violation of the WVUFTA sounds in tort," and affirmed on a different basis. *Id.*

Similarly, in *Branch Banking & Tr. Co. v. Witmeyer*, No. 3:10-cv-55-HEH-DWD, 2011 WL 3297682 (E.D. Va. 2011), the court acknowledged that the case before it "require[d] the Court to address matters of first impression in Virginia case law." *Id.* at *4. Because that court determined it "[was] not possible for [it] to recommend resolution

of the cross-motions for summary judgment without resolving as yet unanswered questions of Virginia state law," it expressly stated it would "cautiously address[] the cross-motions for summary judgment, deciding only those matters of first impression [that were] necessary for the resolution of the claims at issue." *Id.*

In this case, the Court should decline Appellants' invitation to decide whether the Tedericks' WVCCPA claims required proof of intent. Like in *Sheehan*, it appears that "case law in West Virginia is bereft of guidance" on the issue. *See* 650 F. App'x at 55. Indeed, neither party, nor the district court, nor *Amicus* counsel has identified any West Virginia case directly deciding the issue. So, like in *Witmeyer*, the Court is potentially faced with a "matter[] of first impression in [West] Virginia case law." 2019 WL 4958060, at *4.

But unlike in *Witmeyer*, the Court is not required to address any issue of first impression to resolve the claims at issue. That is, it is unnecessary for this Court to decide whether the Tedericks' WVCCPA claims required proof of intent because the Tedericks' WVCCPA claims can be resolved if LoanCare did not overcharge interest.[5] Because

---

[5] *See* Appellant's Br. at 13 ("At bottom, LoanCare overcharged the Tedericks").

LoanCare did not overcharge interest, it did not potentially demand and collected un-owed or unauthorized amounts of interest in violation of W. Va. Code §§ 46A-2-127(d) and 46A-2-128,[6] and the Tedericks' claims fail as a matter of law.

In affirming on this ground, rather than addressing the potentially novel or difficult state-law question of whether the Tedericks' WVCCPA claims required proof of intent, this Court will avoid "elbow[ing] its way into this controversy to render what may be an uncertain and ephemeral interpretation of state law," *Time Warner*, 506 F.3d at 314, "avoid deciding more than is necessary to resolve [the] case . . . . particular[ly] . . . [given that it is] seemingly faced with a state-law issue of first impression," *see Chawla*, 440 F.3d at 648, and avoid potentially creating West Virginia public policy on the scope of the WVCCPA. *See Jacobson*,

---

[6] JA0395 ¶ 44 ("By demanding un-owed amounts of interest from the Tedericks, each of the 18 monthly statements LoanCare sent to the Tedericks violated W. Va. Code § 46A-2- 127(d)."); JA0396 ¶ 48 ("By calculating the Tedericks' monthly interest amount each month before reducing the principal amount by the amount of the prepayment, LoanCare collected unauthorized and un-owed amounts of interest in violation of W. VA. Code § W. Va. Code § 46A-2-128."); *see also* JA0649, JA0652, *Tederick v. LoanCare*, LLC, No. 2:22-CV-394, 2024 WL 1223446, at *10 (E.D. Va. Mar. 21, 2024) (explaining that the Tedericks' WVCCPA claims could be based either on "alleged [Fannie Mae] Guideline violations," or "allegedly fraudulent monthly statements that LoanCare sent to the Tedericks," which were fraudulent due to the misapplication of curtailment payments).

48 F.3d at 783 ("[F]ederal courts in diversity cases. . . should not create or expand that State's public policy.").

## II. LoanCare did not overcharge interest because the Tedericks' interest accrued monthly and in arrears

LoanCare did not overcharge interest, and thus did not violate the WVCCPA, because the Tedericks' interest accrued monthly in arrears. The Tedericks argue that "[t]he dispute between the Tedericks and LoanCare is one of order of application," and that based on "the language found in their Note and Deed of Trust . . . their prepayments[7] should have been applied to their outstanding principal *before* the next month's monthly payment was applied."[8] In their view, this would have reduced the amount of interest they were obligated to pay.[9]

But at its core, the Tedericks' argument turns on a faulty assumption: that under their Note and Deed of Trust, interest accrued

---

[7] Throughout their briefing, the Tedericks refer to their payments to curtail principal as "prepayments." While principal curtailments and prepayments are similar, they are legally different. To the extent possible, *Amicus Curiae* try to credit the Tedericks' characterization of their payments as prepayments, though in *Amicus Curiae*'s view, it does not change the outcome that the Tedericks' payments were properly applied and the Tedericks were not overcharged interest.

[8] *See* Appellant's Br. at 5.

[9] *See* Appellants' Br. at 1 ("Plaintiffs/Appellants Gary and Lisa Tederick were overcharged for interest on their home because Defendant/Appellant LoanCare, LLC misapplied their loan payments.").

daily, as opposed to monthly and in arrears. Because interest under their Note and Deed of Trust accrued monthly in arrears, the Tedericks owed one month's interest during each monthly payment cycle (calculated at the beginning of each payment cycle), regardless of the order that LoanCare applied their monthly payments and prepayments. Consequently, the Tedericks were not overcharged interest.

This becomes apparent by looking at the language of the Tedericks' Note and Deed of Trust and the Fannie Mae Servicing Guidelines.

## A. Under the Note and Deed of Trust, the Tedericks' interest accrued monthly and in arrears

For the vast majority of mortgages, interest accrues monthly in arrears. The same is true for the Tedericks' Note and Deed of Trust.[10]

Interest accruing monthly in arrears simply means that interest is calculated one month at a time, looking backwards. When interest accrues this way, the "amount [of interest] the mortgagee owes at the end of each month does not depend on when the payment is made during that

---

[10] The Tedericks' Deed of Trust does not alter how interest accrued but rather defers to the Note on what interest is owed and how prepayments are applied. *See* JA410, Deed of Trust § 2 ("[A]ll payments accepted and applied by the Lender shall be applied in the following order of priority: (a) interest ***due under the Note*** . . . .") (emphasis added); *id.* ("Voluntary prepayments shall be applied first to any prepayment charges and then ***as described in the Note***.") (emphasis added).

month." *Davis v. Bank of Am., N.A.*, No. CV ELH-19-1010, 2019 WL 4958060, at *7 (D. Md. Oct. 8, 2019). For example, if the mortgagee's monthly payment for March is due on April 1, the amount of interest the mortgagee owes is the same regardless of whether they pay early, sometime in March. This is also true for any prepayments made at the same time as a monthly payment in March.[11] The interest amount owed for March stays the same; however, the prepayment will lower the principal amount owed on the loan, so the interest owed for the next month (April) will be lower.

In the residential mortgage industry, interest accruing monthly in arrears is the default. This means it is not necessary for a mortgage note to specify that interest accrues monthly. Rather, it is assumed that interest accrues monthly unless the mortgage note specifies that interest accrues daily or in some other way.

Even so, certain language in a mortgage note and deed of trust indicates that interest accrues monthly—namely, language that there is

---

[11] The record reflects that all of the Tedericks' so-called "prepayments" were made at the same time as their monthly payments. *Amicus Curiae*'s discussion of the treatment and effect of prepayments (i.e., principal curtailments) is limited to those factual circumstances.

no benefit to paying early. *See Matheson v. Ocwen Fed. Bank FSB*, No. 1:05-CV-02747-ENV-LB, 2008 WL 11413560, at *1 n.3 (E.D.N.Y. June 18, 2008) (explaining that when "interest is accrued monthly . . . . there is no benefit to paying prior to the due date.").[12] For mortgages that accrue interest daily, there is a benefit to paying early, as that reduces the amount of interest owed. But where a note states that a payment will be applied only as of the scheduled due date, or that a prepayment will be applied first to accrued but unpaid interest, there is no benefit. This signals that the intent behind the note is for interest to accrue monthly. *See id.*

For the Tedericks' Note and Deed of Trust, there is no language specifying that interest accrued daily.[13] The only language specifying how interest accrued appears in the Note, which states only that interest

---

[12] According to *Matheson*, "[u]nder a scheduled interest (standard) mortgage, interest is accrued monthly." 2008 WL 11413560, at *1 n.3. The Tedericks allege that their "mortgage loan accrued scheduled interest," which essentially concedes that their Note accrued interest on a monthly basis. *See* JA0389 ¶ 15.

In the same paragraph, the Tedericks allege that because their mortgage accrued scheduled interest, "[they] did not owe interest until the scheduled monthly payment due at the first of the month." *See id.* This is incorrect and demonstrates their misunderstanding of how their mortgage worked. They still "owed" the unpaid interest for the month (as scheduled), their payment for that interest simply was not due until the first of the next month.

[13] *See generally* JA402–05; JA406–22.

14

is payable "at a yearly rate of 5.750%."[14] Because this language does not specify that interest accrued daily, the understanding in the mortgage industry would be that interest accrued monthly. In fact, courts have found that in the context of a residential mortgage, the term "yearly rate" is reasonably interpreted as "denot[ing] monthly interest . . . ." *See, e.g.*, *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638, 645 (Cal. App. 2008).

At the same time, the Note and Deed of Trust make clear that there was no benefit to paying early (either via monthly payment or prepayment). Under § 3 (PAYMENTS), the Note provides that "[e]ach monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal."[15] Similarly, under § 2 (Application of Payments or Proceeds), the Deed of Trust provides that "***all payments*** . . . shall be applied ***[first to] interest*** due under the Note" (emphasis added).[16] This means that even if a monthly payment is submitted before it is due, it is not applied until the due date, and there

---

[14] JA402.

[15] JA402.

[16] JA410 (emphasis added).

15

is no benefit to paying early. Additionally, under § 4 (BORROWER'S RIGHT TO PREPAY), the Note provides that "the Noteholder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note."[17] And § 2 of the Deed of Trust follows suit: "[v]oluntary prepayments shall be applied . . . as described under the Note."[18] This means that even if a prepayment is submitted with a monthly payment before the borrower's monthly payment is due, the Note Holder is authorized to first apply that amount to the accrued yet unpaid interest— i.e., the monthly interest that has accrued but for which payment is not yet due.

Given this, there can be no confusion that under the Tedericks' Note and Deed of Trust, interest accrued monthly in arrears. For each payment cycle, a full month of interest accrued. And regardless of the order that LoanCare applied the Tedericks' payments, the amount of interest the Tedericks owed for that payment cycle remained the same.

---

[17] JA403.

[18] JA410.

## B.  Under the Fannie Mae Servicing Guidelines, the Tedericks' interest accrued monthly and in arrears

The Tedericks' Note and Deed of Trust are Fannie Mae/Freddie Mac uniform instruments. As a result, the Fannie Mae Servicing Guidelines are highly relevant to how they should be interpreted.[19]

### 1.  Fannie Mae and Freddie Mac introduce the Fannie Mae/Freddie Mac uniform instruments

Until the 1970s, conventional residential mortgage loans were mostly local in nature. *See generally* U.S. Dep't of Hous. & Urb. Dev., *The Secondary Market in Residential Mortgages* at 12 (1982).[20] In 1970, Congress created the government-sponsored enterprise (GSE) known as Freddie Mac,[21] with the mission of "increas[ing] the availability of funds

---

[19] Freddie Mac's servicing guidelines, which generally accord with Fannie Mae's would also be relevant. Given that the focus of this litigation has been on the Fannie Mae Servicing Guidelines, *Amicus Curiae* focus its argument on those.

[20] https://www.huduser.gov/portal//Publications/pdf/HUD-11648.pdf.

[21] "[A] government sponsored enterprise . . . is a privately owned but publicly chartered financial services corporation created by the United States." *See Piszel v. United States*, 833 F.3d 1366, 1370 (Fed. Cir. 2016). Freddie Mac and Fannie Mae are the two best known GSEs, and are chartered with the purpose of "establish[ing] secondary market facilities for residential mortgages" to, among other things, "provide stability in the secondary market for residential mortgages" and "promote access to mortgage credit throughout the Nation . . . ." *See* 12 U.SC. § 1716 (Fannie Mae Charter Act). Though privately owned, they operate under the conservatorship and control of the Federal Housing Finance Agency (FHFA), such that they have "no fiduciary duties to the company or its stockholders, [but rather] owe their fiduciary duties of care and loyalty solely to FHFA." *See* Fannie Mae 10-K, *available at* https://fanniemae.gcs-web.com/node/44631/html.

for mortgage lending by developing and maintaining a nationwide secondary market for conventional residential mortgages." *Id.* at 9. Shortly after this, Congress similarly authorized another GSE known as Fannie Mae "to purchase conventional mortgage loans." *Id.* at 10. Together, Freddie Mac and Fannie Mae became the first—and remain the largest—purchasers of conventional residential mortgages on the secondary market. *See* Andrea J. Boyack, *Laudable Goals and Unintended Consequences: The Role and Control of Fannie Mae and Freddie Mac*, 60 Am. U.L. Rev. 1489, 1499 (2011).

A major obstacle to robust secondary markets for mortgage loans was that most mortgages were being made using non-standardized loan agreements from local lenders. *See The Secondary Market in Residential Mortgages*, *supra*, at 12–13. So, in 1975, Fannie Mae and Freddie Mac "introduced uniform legal documents for conventional mortgages in each state," and required that loans they purchase be documented on their forms. *Id.* at 14. Because of this, an estimated 90 percent of all conventional mortgages are originated using the Fannie Mae/Freddie Mac uniform instruments. *See* Julia Patterson Forrester, *Freddie Mac Uniform Mortgage Instruments: The Forgotten Benefit to Homeowners*, 72

Mo. L. Rev. 1077, 1086–87 (2007); *see also* Fannie Mae Uniform
Instruments Fact Sheet, *available at* https://singlefamily.fanniemae.co
m/media/27911/display.

Accordingly, mortgage originators, mortgage servicers, and
participants in the mortgage secondary market nationwide rely on a
uniform interpretation of the Fannie Mae/Freddie Mac uniform
instruments. Indeed, a uniform interpretation furthers the goal Congress
had when it created Fannie Mae and Freddie Mac: to create a robust
secondary market to provide liquidity and stability to the U.S. housing
market and to make mortgage credit more accessible to everyday
Americans. But as shown below, the Tedericks' interpretation of the
Fannie Mae/Freddie Mac uniform instruments diverges from the uniform
understanding and practice of the mortgage industry. Thus, adopting the
Tedericks' interpretation would harm consumers by creating uncertainty
in the secondary markets, making mortgage credit less accessible.

> 2.   Fannie Mae publishes Servicing Guidelines that are
>       relevant to interpreting the uniform instruments

Fannie Mae outsources the servicing of the mortgages it purchases.
To ensure that those mortgages are serviced properly (and in a way that
protects consumers like the Tedericks), Fannie Mae publishes Servicing

Guidelines, which it requires its servicers to follow.[22] All of the mortgages serviced on Fannie Mae's behalf were originated using Fannie Mae uniform instruments. So it is understood in the residential mortgage industry that the Guidelines reflect Fannie Mae's intent regarding the uniform instruments, such that they are highly relevant to interpreting those documents.

This understanding is supported by analogous caselaw. "When dealing with uniform contract language imposed by the United States, it is the meaning of the United States that controls . . . ." *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 442 (1st Cir. 2013). The contract should be interpreted as "the United States intended . . . regardless of the personal interpretation offered by a party." *Id.* Indeed, "[i]f such contracts were subjected to different meanings depending merely on whether a particular party's interpretation was plausible, it would not only undermine the efficiency benefits of standardization, but it would also undermine the federal policy that motivated the United

---

[22] *See* Fannie Mae Mortgage Selling and Servicing Contract at § V.A.3 (Servicing According to Guides) ("Any mortgage serviced under this Contract, which we own or in which we have purchased a participation interest, must be serviced by the Lender according to the provision in our Guides . . ."), *available at*, https://singlefamily.fann iemae.com/media/35796/display.

States to impose uniform contractual obligations on parties in the first place." *Id.*

While Fannie Mae is not a government agency, it is under the conservatorship and control of the FHFA (a government agency),[23] so the same factors animating the *Kolbe* decision apply. The Fannie Mae/Freddie Mac uniform instruments are uniform contracts imposed by Fannie Mae, a government-sponsored enterprise.[24] Fannie Mae drafted the uniform instruments to achieve certain public policy aims,[25] so they should be interpreted as Fannie Mae intended (as set forth in the Servicing Guidelines). Further, because the meaning of the Fannie Mae/Freddie Mac uniform instruments is not one of personal interpretation, even if the Court concludes that the Tedericks have put forth a plausible interpretation of the uniform instruments that interest accrued daily, that interpretation must be rejected because it conflicts

---

[23] *Supra* note 21.

[24] *Supra* note 21.

[25] "Fannie Mae is one of two (the other being Freddie Mac) federally-chartered government-sponsored enterprises that serve the public policy of expanding home ownership to moderate and low-income families, in part, by supplying capital and liquidity for residential mortgages." *In re Fannie Mae Sec.*, 247 F.R.D. 32, 34 (D.D.C. 2008).

21

with Fannie Mae's intent under the Servicing Guidelines that interest accrued monthly in arrears.

      3.    <u>The Servicing Guidelines confirm that interest accrues monthly in arrears</u>

The Fannie Mae Servicing Guidelines show that Fannie Mae interpreted uniform instruments like the Tedericks' Note and Deed of Trust as providing for interest accrued monthly in arrears. To begin, Guideline F-1-109 (Processing Mortgage Loan Payments and Payoffs) provides that interest is calculated monthly in arrears: "If the mortgage loan is . . . a fixed-rate first lien mortgage loan . . . [t]hen the interest portion must be determined by calculating . . . 30 days' interest on the UPB [unpaid principal balance] as of the LPI date and using the current accrual rate."[26] The "LPI Date" is "[t]he due date of last paid installment (DDLPI) that had been collected for the mortgage"[27]—i.e., for the Tedericks, the first day of the prior month. Said more plainly, the interest for the Tedericks was calculated a month at a time (with 30 days

---

[26] JA1573. This reflects what is known as a 30/360-day interest accrual schedule, which is a monthly accrual in arrears. *See* JA0894 ¶ 30.

[27] *See* Fannie Mae, Loan Servicing Data Utility Data Definitions, *available at* https://singlefamily.fanniemae.com/media/16336/display.

representing a month), and that calculation occurred on the first day of the prior month.

Further, the Guidelines, like the Note and Deed of Trust, reflect that there is no benefit to paying early—one of the hallmarks of interest accruing monthly in arrears. Guideline F-1-109 provides that monthly payments are applied to interest before principal (in accord with § 3 of the Note and § 2 of the Deed of Trust).[28]

And the Guidelines address order of application of monthly payments and principal curtailments (what the Tedericks are calling prepayments).[29] Under the facts of the Tedericks' case—where a principal curtailment is submitted with the scheduled monthly payment—the Guidelines require that the servicer "apply the scheduled monthly payment first, then apply the principal curtailment."[30] As a result, for each of the Tedericks' combined monthly payment and prepayment checks, their monthly payment would have been applied first to the principal and interest owed for that month, and then the

---

[28] JA1573.

[29] *See* JA1574.

[30] *Id.*

principal curtailment would have been applied to reduce the unpaid principal balance and the amount of interest owed for the next month.

That this was Fannie Mae's intent is further supported by Jenise Hight, a Vice President for Single-Family Credit Risk Policy at Fannie Mae, who submitted a declaration confirming that LoanCare applied the Tedericks' payments correctly under the Fannie Mae Servicing Guidelines.[31]

### 4.  The Tedericks fail to distance themselves from the Fannie Mae Servicing Guidelines.

Faced with LoanCare's compliance with the Fannie Mae Servicing Guidelines, the Tedericks try to downplay the Guidelines' relevance by arguing that they "are not parties to those guidelines and are not bound by them." *See* Appellant's Br. at 40. The Court should reject this argument. The Servicing Guidelines are not relevant because they are binding on the Tedericks. They are relevant because they reflect Fannie Mae's intent. *See Kolbe*, 738 F.3d at 442 ("When dealing with uniform contract language imposed by [Fannie Mae], it is the meaning of [Fannie Mae] that controls . . . .").

---

[31] JA1941–45.

Further, the Tedericks' attempt to distance themselves from the Servicing Guidelines appears disingenuous. The Tedericks incorporated the Guidelines into their Second Amended Complaint,[32] they argued before the district court that the Guidelines provide "helpful context" to understand the Note and Deed of Trust because the Note and Deed of Trust are Fannie Mae/Freddie Mac uniform instruments,[33] and at summary judgment, the Tedericks' live claims included a claim that LoanCare violated the WVCCPA because it violated the Guidelines.[34] It is only now that they are faced with the fact that LoanCare complied with Fannie Mae's Servicing Guidelines that the Tedericks argue that they are not relevant.

*    *    *    *    *

In short, the Tedericks' Note and Deed of Trust are Fannie Mae/Freddie Mac uniform instruments, so the Fannie Mae Servicing Guidelines are highly relevant to how they should be interpreted. The Servicing Guidelines show that under the Tedericks' Note and Deed of

---

[32] JA0389–90 ¶¶ 16–18.

[33] JA0593.

[34] JA0649.

Trust, interest accrued monthly in arrears. As a result, the Tedericks owed one month's interest during each monthly payment cycle (calculated at the beginning of each payment cycle), regardless of the order that LoanCare applied their monthly payments and the prepayments submitted with them. Or said another way, regardless of the order that LoanCare applied the Tedericks' payments, LoanCare did not overcharge interest. And because LoanCare did not overcharge interest, it did not violate the WVCCPA by demanding or collecting unowed or unauthorized amounts of interest. *See* W. Va. Code §§ 46A-2-127(d) and 46A-2-128.

This Court can, and should, affirm on this ground. *See Strawser v. Atkins*, 290 F.3d 720, 728 n.4 (4th Cir. 2002) ("[W]e may affirm on any ground revealed in the record.").[35]

---

[35] To the extent that the Court has any federalism concerns arising from Appellants' argument that the district court held that the WVCCPA required proof of intent, this Court should still affirm but may vacate that portion of the district court's ruling. In other cases where "the district correctly awarded summary judgment . . . [but] appears to have unnecessarily addressed an important and novel question of [state] law," this Court has "vacate[d] as unnecessary the district court's [unnecessary] ruling" and affirmed on other grounds. *See Chawla*, 440 F.3d at 648.

## CONCLUSION

For these reasons, *Amicus Curiae* respectfully requests that the Court affirm the district court's grant of summary judgment on the ground that LoanCare did not overcharge interest and thus did not violate the West Virginia Consumer Credit and Protection Act.

Respectfully submitted,

Dated: September 3, 2025        By:    _/s/ Sam Bragg_____
                                       Sam Bragg
                                       **ALSTON & BIRD LLP**
                                       2200 Ross Ave., Ste. 2300
                                       Dallas, TX 75201
                                       Telephone: (214) 922-3400
                                       sam.bragg@alston.com

                                       Nanci Weissgold
                                       **ALSTON & BIRD LLP**
                                       The Atlantic Building
                                       950 F Street, NW
                                       Washington, DC 20004
                                       Telephone: (202) 239-3300
                                       nanci.weissgold@alston.com

                                       *Attorneys for Amicus Curiae*
                                       *Mortgage Bankers Association*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**No. 25-1315**

*Gary Tederick and Lisa Tederick v. LoanCare, LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and
Type Style Requirements

This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    <u>X</u>    this brief contains <u>4,019</u> words

This brief complies with the typeface and type style requirements because:

    <u>X</u>    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14 point

*/s/ Sam Bragg*
Sam Bragg
**ALSTON & BIRD LLP**
2200 Ross Ave., Ste. 2300
Dallas, TX 75201
Telephone: (214) 922-3400
sam.bragg@alston.com

*Attorney for Amicus Curiae*

Dated: September 3, 2025

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 25-1315**

*Gary Tederick and Lisa Tederick v. LoanCare, LLC*

### CERTIFICATE OF SERVICE

I, Sam Bragg, hereby certify that today, September 3, 2025, I have caused a true and correct copy of the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Counsel of record are active registered CM/ECF users who will be served by the appellate CM/ECF system.

/s/ Sam Bragg
Sam Bragg
**ALSTON & BIRD LLP**
2200 Ross Ave., Ste. 2300
Dallas, TX 75201
Telephone: (214) 922-3400
sam.bragg@alston.com

*Attorney for Amicus Curiae*